

FILED

June 30 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA**

In re:
COURT OPERATIONS UNDER THE EXIGENT
CIRCUMSTANCES CREATED BY THE OUTBREAK       Case No. 2:20mc7
OF CORONAVIRUS DISEASE 2019 (COVID-19):
REVISED SCHEDULE FOR THE RESUMPTION OF
CRIMINAL JURY TRIALS

### General Order No. 2020-19

The United States District Court for the Eastern District of Virginia has continued to closely monitor the outbreak of Coronavirus Disease 2019 (COVID-19), as well as the developing guidance from the Centers for Disease Control and Prevention (CDC), and local health authorities.  On May 26, 2020, General Order No. 2020-16 was issued, establishing a preliminary timeline for the phased expansion of Court Operations and setting a preliminary date for the resumption of criminal jury trials in July of this year.  Based on evolving conditions in Virginia and across our nation, as well as recent studies reported by the CDC, the issuance of a report on the resumption of trials by the "jury subgroup" of the COVID-19 Judicial Task Force (Subgroup Report) established by the Administrative Office of the United States Courts (AO),[1] and new information from other sources discussed below, the Court finds

---

[1] The Subgroup Report is available at https://www.uscourts.gov/sites/default/files/combined_jury_trial_post_covid_doc_6.10.20.pdf.  While such report presents very helpful guidance, it indicates that, like all other decisions during this evolving pandemic, "[t]he appropriate time to reconvene juries will differ state by state, district by district, and perhaps even division by division."  Subgroup Report, at 1.

that an extension of two months is necessary before criminal jury trials can safely resume in a manner that guarantees every defendant a fair trial in the midst of a pandemic involving a deadly and easily transmitted disease.  The Court makes such finding after countless consultations with various stakeholders, including judges from each Division of this Court, lawyers from the U.S. Attorney's Office, Federal Public Defender's Office, and this Court's Criminal Justice Act panel (CJA panel), representatives from the Virginia Department of Health, the General Services Administration (GSA), and the U.S. Marshals Service, as well as court unit executives and other individuals responsible for operations in our Courthouses.  The Court's finding is based not only on the time necessary to prepare and retrofit our Courthouses and courtrooms, but also to ensure that the resumption of criminal jury trials provides the accused defendant with the full panoply of trial rights, to include not only the right to an in-person live trial, but one where the jury represents a fair cross-section of the community and will not be encouraged to rush to judgment during deliberations based on a fear of exposure to COVID-19.  Accordingly, for the reasons explained below, criminal jury trials will resume in this District **on or after September 14, 2020**.

## I. COVID-19 data in Virginia and the United States

For the last several months, the Court has carefully tracked relevant COVID-19 statistics, to include the number of COVID-19 cases, hospitalizations, and fatalities, both in Virginia and across the United States.  Even though Virginia implemented a "stay-home" order in late March of this year, newly reported COVID-19 cases did not peak until the end of May.  However, a downward trend in the "percent positivity" of COVID-19 tests during May provided statistical evidence of the benefits of the stay-home order occurring prior to the end of May.  Therefore, the Court issued General Order No. 2020-16 in late May laying out an advance timeline for the next steps in the phased expansion of Court operations in this District, scheduled to begin on June 11, 2020. The planned "first step" involved permitting non-critical/non-emergency in-person proceedings in our Courthouses if, and only if, an in-person proceeding could be safely conducted and was deemed appropriate by the presiding judge based on the circumstances of that case and the participants involved in the hearing.  Drawing from recommendations made by the AO in its Federal Judiciary COVID-19 Recovery Guidelines, General Order No. 2020-16 stated that, even after June 11, 2020, "judges of this Court will continu[e] to use video- and tele-conferencing to the greatest extent possible, for both civil proceedings and criminal

proceedings authorized by the CARES Act."  Gen. Order 2020-16, at 2 (emphasis in original).

In addition to relaxing the standard for conducting in-person proceedings, General Order No. 2020-16 continued all civil jury trials indefinitely, and indicated that criminal jury trials would not resume before July 7, 2020, at the earliest.  The General Order explained that such date was announced "in order to provide the greatest degree of predictability that is possible during this unpredictable time," highlighting that "emerging case statistics and the response of local and statewide authorities" will be a key factor in the Court's "later decision as to whether [July 7, 2020] remains an appropriate date to safely begin conducting criminal jury trials or whether the resumption of such trials must be further delayed."  Id. at 16 n.12.

Following the issuance of General Order No. 2020-16, the first two weeks of June showed great improvement in COVID-19 statistics in Virginia, including a "sustained downward trend" in newly reported COVID-19 cases that satisfied the "gating criteria" established by the AO in its Federal Judiciary COVID-19 Recovery Guidelines.  During this same time, many other states were experiencing notable improvements in their COVID-19 statistics, with most states, including Virginia, loosening restrictions and allowing more businesses to reopen.  Unfortunately, over the last two weeks, new case counts in Virginia have "plateaued" at an

4

average of approximately 520 new cases per day, a level that is greater than nearly two-thirds of other states, and is similar to the number of cases that were reported in Virginia during the third week of April, a time when our state, and most of the rest of the country, was largely shut down.  The average number of newly reported COVID-19 deaths in Virginia similarly peaked in late May at around thirty-four daily deaths, and trended downward throughout early and mid-June until it reached a low of about nine daily deaths.  Over the last week, however, the number of newly reported deaths began climbing again, with the seven-day average now standing at seventeen newly reported deaths.

Equally as concerning in light of the mobility of our country's population, and the fact that federal criminal jury trials often involve witnesses from out-of-state, the last ten days have evidenced a rapid resurgence in COVID-19 cases and/or hospitalizations in a significant number of states, many of which implemented less restrictive and/or shorter "stay-home" orders than Virginia.  This alarming spike in cases demonstrates that the "first wave" of COVID-19 infections in this country is far from over, as illustrated by the fact that multiple states recently adopted policies requiring a fourteen-day quarantine for

individuals traveling from states with a statistically significant COVID-19 resurgence.[2]

Although Virginia's recent multi-week decline in new cases, followed by a plateau, is certainly encouraging news, Virginia has plateaued at a level that still presents a high risk to the public, with such sustained plateau further indicating that Virginia is no longer progressing toward meeting the "gating criteria" suggested by the AO as a guide for the further expansion of Court operations.[3] Accordingly, the evolving conditions across our District, and across our nation, including in our neighboring state of North Carolina, suggest caution in determining when to safely resume jury trials.  The ongoing, and even increasing, community spread mandates that additional protections be adopted to keep our jurors, litigants, lawyers, court staff, and the public safe while inside our Courthouses, and the greater the degree of resurgence in our

_____

[2] To lend some context for the recent resurgence, just two weeks ago, the United States reported a daily average of approximately 21,000 new COVID-19 cases.  As of yesterday, the daily average has increased to over 38,000 new cases.  The diverging viewpoints of different governors over the past two months underscores the fact that choosing how and when to reopen and/or expand operations is far from an exact science, and risk tolerances play a large role in any such decision.

[3] The AO's COVID-19 Task Force suggests that courts consider resuming jury trials only after "a steady decrease in COVID-19 cases and hospitalizations for at least two weeks."  Restarting Jury Selections and Jury Trials in the COVID-19 World: A Jury Administration Pandemic Tool Box of Ideas (Task Force, June 9, 2020).  Such condition is not currently satisfied in Virginia, nor is it satisfied in this District (it appears that approximately four out of five COVID-19 cases in Virginia are in the Eastern District).  The new outbreaks occurring in numerous states, to include our bordering state of North Carolina, are strong evidence that it is premature to compel jurors to report to our Courthouses in the weeks immediately ahead.

nation, the greater the hurdle that this Court will have to overcome to convince each summoned jury that their safety will be ensured in our Courthouses.[4]

## II. Modified Summons Packet

Consistent with the AO's Jury Subgroup Report on the safe resumption of jury trials, this Court has worked diligently to develop a modified juror information packet to be provided to all prospective jurors, which includes a reassuring letter describing safety precautions implemented by the Court, a summons, and a "Supplemental Screening Questionnaire."  Cf. Subgroup Report, at 2-3 (discussing the need to develop enhanced communications with prospective jurors and providing suggested content of a "supplemental questionnaire").  Our modified juror information packet will be released to the public through publication on the Court's website in the near future, and such packet reflects

---

[4] Virginia is currently in "Stage Two" of the reopening plan announced by the Governor of Virginia and is planning on moving into "Stage Three" as early as tomorrow.  Such planned expansion, however, only sets limits as to what activities are permissible, and does not require any business, public school, or citizen to engage in any activity that is determined to be unsafe by decisionmakers at the local level.  Stated another way, such state-level guidance merely authorizes certain businesses and members of the public to freely make choices about what risks they are willing to tolerate.  By contrast, the calculus for the safe resumption of criminal jury trials is critically different because a criminal jury trial mandates the appearance of numerous prospective jurors, as well as other trial participants, and once present, such individuals are compelled to stay in the same indoor space the entire day and cannot elect to quickly leave the area if the exposure risk appears too high (as a member of the public could in a business establishment).  Moreover, the degree of focus and attention we ask our jurors to maintain throughout the entire trial process, a focus and attention that every accused defendant deserves, is simply incomparable to the focus involved when a member of the public makes a relatively brief voluntary visit to a store or restaurant during the pandemic.

multiple rounds of feedback from other judges of this Court, our jury administrator, the U.S. Attorney's Office, Federal Public Defender's Office, and the Court's CJA Panel Attorney District Representative, to ensure that the mailing complies with all applicable laws and procedures, and achieves the greatest benefit. Additionally, recognizing the critical need to consider local conditions in Virginia, the Court has relied on guidance from local health experts regarding the safest manner in which to resume jury trials during a pandemic involving the ongoing community spread of a highly infectious and deadly disease.[5]    Drawing on recommendations from local health officials, who advise that a multi-layer defense system is necessary to safely resume jury trials,[6] the modified juror information packet was designed, in

---

[5] The undersigned judge is not an infectious disease expert, and like many public officials, the Court has devoted countless hours to grappling with two consistent and disturbing truths: (1) the contours of the COVID-19 outbreak change on a weekly, if not daily, basis, with many indicators at best providing a window into the situation a week to ten days earlier, which can result in research and outside advice becoming outdated as soon as it is received; and (2) health experts are simply not in agreement over countless aspects of the pandemic in light of the "novel" nature of this virus, and conflicting expert advice increases the difficulty of, and the time needed to make, critical decisions that could impact the lives of persons called into our Courthouses.  These challenges therefore mandate that the Court take small and calculated steps as it expands operations.

[6] Health officials advised on the benefits of health screenings performed by medical personnel at our Courthouse entrances, the use of a pre-screening questionnaire to identify prospective jurors with pre-existing health conditions, and the need to develop modified trial procedures that preserve social distancing.  However, in addition to such issues, health officials also raised concerns regarding the documented fact that the COVID-19 pandemic has disproportionately impacted African-Americans, and other minority communities, which has the potential to reduce the diversity of the panel of prospective jurors that appear for jury service.

part, to reduce the number of potentially infectious or otherwise COVID-related unavailable prospective jurors that arrive in person at our Courthouse only to be summarily deferred to a later date for jury service. The packet is therefore intended to decrease the COVID-19 exposure risk, and the anxiety level, of individuals that are qualified to serve on a jury in the coming months.

### III. Juror Response Period and Availability

In order to ensure that individuals that are randomly selected to report for jury duty actually receive their summons in the mail and have sufficient time to return it, the Court typically mails a letter and summons to prospective jurors approximately seven weeks prior to the first anticipated report date. The jury administrator uses the first six weeks of this time to receive and review responses, research inaccurate addresses for any summons that is returned as undeliverable, respond to questions from members of the public that have received a summons, compile and evaluate requests for excusal and/or deferrals, and mail a follow-up summons if none is returned. The jury administrator then provides the list of qualified jurors, and list of those with discretionary excusal/deferral requests, to the presiding judge within the week before the jury's anticipated report date. In consideration of speedy trial concerns, and in an effort to expedite the resumption of criminal jury trials in this District, this Court considered shortening its typical return/review period

for the summons and questionnaire. However, after careful consultation with this Court's experienced jury administrator and other sources, the undersigned judge found it necessary to retain such period in order to ensure that the individuals that do report for jury duty <u>represent a fair cross-section of the community</u>.

First, the addition of the jury questionnaire, the number of follow-up questions that it will likely generate, and the vast increase in the number of summonses being mailed out due to the challenges of obtaining an adequate spectrum of jurors, all counsel against shortening the response period. Second, consistent with concerns raised by public health officials and the defense bar, the Court has grave concerns that shortening the timeframe for responses may reduce the diversity of our jury pool. Notably, in addition to such concerns raised by local health officials, on June 15, 2020, the CDC issued a report noting that: (1) the distribution of identified COVID-19 cases across various populations suggests that African-Americans and Hispanic persons "are disproportionately affected by the COVID-19 pandemic"; and (2) there are "higher proportions of black and Hispanic persons among hospitalized COVID-19 patients than were in the overall population." <u>See</u> https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6924e2-H.pdf. Consistent with such documented findings, retaining the typical return period is necessary to allow the greatest number of individuals who are struggling with such

disproportionate medical impact, as well as any associated disproportionate family circumstance and economic impacts, to receive and return their summons and make the necessary arrangements to appear for jury service in September. See Subgroup Report, at 4 (addressing the need to "[p]lan for a higher number of jurors requesting to be excused," and recommending that courts "monitor closely, and maintain statistics on, the impact these excusals and deferrals may have on minority representation").

With the retention of the typical response period, and the mailing of the summons packets in July, the judges presiding over the first criminal jury trials to resume will receive prospective juror lists, and what will likely be a substantial number of requests for excuse/deferral, in late August.  This timeline will provide some additional time for the presiding judge to review the requests for excuse/deferral, and allow the jury administrator to "backfill" the list to provide a substitute name for each prospective juror that is excused/deferred.[7]  The adopted timeline will also preserve for the presiding judge the option, in consultation with defense counsel and counsel for the Government, to send out a case-specific agreed-upon jury questionnaire to those on the finalized list in order to further limit the duration of

---

[7] The AO's COVID-19 Task Force has suggested that courts consider "add[ing] additional time between summonsing and having jurors report, to provide time to process excuses, etc."  Restarting Jury Selections and Jury Trials in the COVID-19 World: A Jury Administration Pandemic Tool Box of Ideas (Task Force, June 9, 2020).

questioning and number of jurors required to sit in one of our courtrooms to answer questions regarding their qualifications. While not a required step, allowing sufficient time for counsel and the presiding judge to discuss whether such step is appropriate in the first cases to be tried by a jury in this District during the deadly pandemic furthers the interests of justice as it preserves the ability for the parties and Court to work together to streamline what will surely be an atypically long and complicated voir dire process due to social distancing and face covering requirements.

Additionally, even if the presiding judge does not utilize a case-specific voir dire questionnaire, in light of the COVID-19 summons health questionnaire's request that jurors update their responses as their situations change, there is a high likelihood that there will be a need for the jury administrator to perform some follow up screening, either by phone or by mail, in the weeks prior to trial in order to address recent illnesses and COVID-19 family situations. Cf. Subgroup Report, at 3 (acknowledging that while a supplemental questionnaire will be mailed "weeks prior to trial," there will be a need to conduct further follow-up prior to trial). Moreover, in light of the recent alarming spike in COVID-19 cases in other states, this Court also recognizes that it may be necessary in the future to again restrict access to our Courthouses for individuals who have traveled to identified COVID-

19 "hotspots" during the two weeks prior to entry—thus requiring potential follow-up with jurors by our jury administrator.  If it is necessary to reimpose such restrictions, the list of states presenting a grave enough concern to require a fourteen-day quarantine after travel will likely need to be updated at least twice a month in light of the speed at which outbreaks emerge.  It is therefore impossible to effectively address such issue until two to three weeks before the start of trial.  All of this makes for a time-intensive process leading up to trial.

### IV. Ensuring a Fair Trial

As suggested above, the Court's decision to extend the date for resumption of criminal jury trials to September 14, 2020, reflects feedback the Court received from the defense bar, to include concerns raised by defendants that jurors need to have a lengthy period (within reason) to become comfortable with the idea of sitting in an enclosed courtroom, with a group of strangers, for the entire day.  The Court's CJA Panel Attorney District Representative communicated with the Court on how, and when, to safely resume jury trials in this District and provided the Court with a copy of a June 2020 report issued by the National Association of Criminal Defense Lawyers (NACDL Report), with the report discussing the "unprecedented public health risks caused by the COVID-19 pandemic" and the "enormous challenges for court operations especially in criminal matters where liberty, and in

some venues, life are at stake." NACDL Report, at 2.[8] The NACDL
Report discusses the inherent conflicts that arise when
endeavoring to preserve all of an accused defendant's rights and
recommends that best practices for resuming trials "need to
prioritize evidence-based health and safety measures and the
preservation of fundamental rights over the ministerial needs of
docket management." Id. at 7. The NACDL Report therefore finds
that "Courts must recognize the criminal accused's right to speedy
trial might be subjugated based on the current state of affairs
including lack of a vaccine, substantial rates of infection and
mortality, and economic hardship."[9] Id.

While this Court does not individually opine on the various
conclusions provided in the NACDL Report, the Report provides very
useful context from the perspective of the individuals whose role
in the trial process is most directly centered on protecting the
rights of accused defendants, including their right to a speedy
trial. This critical viewpoint must be balanced by the Court with
all of the other relevant evidence to determine not only how, but

---

[8] The NACDL report is available at https://www.nacdl.org/getattachment/
56802001-1bb9-4edd-814d-c8d5c41346f3/criminal-court-reopening-and-public-
health-in-the-covid-19-era.pdf.

[9] The report actually goes even further by concluding that, at least as of
early June, and "particularly in areas of significant community-based
transmission," the resumption of jury trials would be "reckless and
irresponsible" and would "undermine the truth-seeking purpose of trials
given the well-documented and understandable fear, panic and uncertainty on
the part of jurors, witnesses, court staff, deputies, judges, prosecutors
and defense counsel." NACDL Report, at 8.

when to resume criminal jury trials in this District.  While the safety concerns of jurors is a critical point, the safety concerns of defense counsel is equally as important given that preparations for a criminal jury trial typically involve defense counsel spending numerous hours in close contact with their clients, witnesses, government representatives, and others.  Current conditions at different jails make it more difficult, and more time consuming, for defense counsel to consult with their clients in preparation for trial.  Similarly, Government counsel's need to coordinate movement of incarcerated cooperating witnesses, and other witnesses from out of state, presents very different challenges in the midst of the pandemic that did not exist just a few months ago, not the least of which is transfer of incarcerated witnesses between facilities with COVID-related restrictions.

Having considered the NACDL Report, the AO's Jury Subgroup Report, and input from local stakeholders and local health officials, the Court concludes that conditions specific to this District do not warrant the resumption of jury trials in July or August, months during which numerous additional steps will be taken to prepare for the resumption of trials in early September.  See Subgroup Report at 2 ("Jurors must be given reasonable assurance of their safety before participating in the jury process.  They must be comfortable during the course of a trial, and be able to focus on the evidence and not the risk of a COVID-19 infection.").

While initially improving, and then stagnating, conditions in Virginia created the obligation (and ability) for this Court to continue forward with the complicated process of convening criminal jury trials in the midst of a deadly nationwide pandemic; however, the Court cannot prioritize speed over the critical steps needed to preserve every accused defendant's right to <u>a fair trial</u>. For all of these reasons, to include the medical and financial impact of COVID-19 being suffered by large swaths of the public, and the disproportionate impact shouldered by African-American and Hispanic communities, the Court finds that retaining the six-week return period, and providing sufficient time for any follow-up "pre-screening" of jurors authorized by the presiding judge, strikes the proper balance between defendants' speedy trial rights and the critical and fundamental need to ensure a fair trial with <u>a focused jury</u> that can operate without fear and is selected from a <u>fair cross-section of the community</u>.[10]

---

[10] While mindful of the differences in the typical state and federal criminal jury trial, this Court has monitored the decisions of the Supreme Court of Virginia regarding the resumption of state court proceedings in Virginia. Just last week, the Supreme Court of Virginia issued its "Sixth Order" extending the declaration of judicial emergency, and announcing: (1) that the Chief Justice has created a Jury Task Force to address, in consultation with the Virginia Department of Health, how to safely resume jury trials; and (2) that "each chief circuit court judge shall develop a plan for their circuit that describes <u>how and when</u> they will be able to <u>safely conduct jury trials</u>" with such plan due to the Chief Justice by August 17, 2020, and jury trials suspended until <u>at least</u> the time that individual plans are approved. http://www.vacourts.gov/news/items/covid/2020_0622_scv_sixth_order.pdf (emphasis added).

## V. Additional Preparations

In addition to the time necessary to research, develop, distribute, receive, and analyze juror questionnaires, the Court has devoted countless hours working toward planning and modifying our physical spaces to allow for the safe resumption of jury trials. In light of the recent plateau in new cases in Virginia, and the concerns raised in the AO Jury Subgroup Report, the NACDL Report, and most importantly, those raised by local attorneys[11] and health officials, the resumption of criminal jury trials in July or August would be premature in this District.

Notably, many of the protections that will be in place in September, as recommended by local health officials, required multi-week or multi-month lead times in order to ensure the greatest protection for our jurors, witnesses, defendants, and all other individuals involved in the trial process.  This includes identification of at least one courtroom in each Division to be used for criminal jury trials and conducting a walkthrough study to determine how to best retrofit such courtroom to allow for social distancing without materially impacting the ability of all participants to hear and see the evidence.  Physical changes

---

[11] While the Court has no involvement whatsoever in such matters, it is the Court's understanding that additional discussions are/will be occurring between counsel in many pending criminal cases in our District to determine whether an agreed resolution of the case is possible.  For those that are not resolved, the Court will work with counsel to develop a schedule to try cases as expeditiously as possible, subject to Courthouse limitations.

include, among other things, the installation of plexiglass partitions, some of which needed to be special ordered.[12]

Separately, the Court's IT Department has assisted in researching and purchasing "headset kits" that will allow for confidential communications in our courtrooms without the need for close-contact.  These headsets can be utilized by both defense counsel and clients for their own private communications, for side-bar conferences depending on varying courtroom layouts and the preferences of the presiding judge, and for juror questioning where a potential juror would normally discuss a matter outside the hearing of other jurors while gathering closely at the bench with counsel and the presiding judge.  The IT Department will be heavily involved in testing such equipment to ensure it functions properly and in training courtroom personnel on its use to allow for streamlined proceedings during trial.  Additionally, for some of our courtrooms, other technological changes are being made, such as putting technology in place to project the image of the witness onto a screen in the gallery as an additional aid for juries that will be seated there during trial (to allow for social distancing).

In determining the safest way to manage a large number of people in the same enclosed room, the Court has carefully analyzed

---

[12] Like many items during the pandemic, plexiglass partitions are not only presently in high demand, but specially sized dividers that are manufactured through "special order" have proven necessary for some of the courtrooms in our District, and have come with delivery lead times of up to ten weeks.

a COVID-19 courthouse safety report of an epidemiologist from within the Fourth Circuit, and guidance provided by representatives from the Virginia Department of Health. On-site visits by local health personnel may occur in at least some of our Courthouses. The determination of an appropriate "health screening" procedure to use during jury trials is also still in development as the Court has needed to carefully evaluate what can only be described as diverging viewpoints received from different medical experts who have not had a sufficient opportunity to fully analyze the "novel" disease that is spreading within our District. In the midst of these complex questions, for which there are no clear answers, the Court has explored, and will continue to explore, various health screening options. Needless to say, exploration of such screening options often requires coordination with the U.S. Marshals Service, which provides courthouse entrance security, the GSA, which owns most of our Courthouses, and the landlords of our leased facilities. During this process, the Court has steadfastly adhered to the concept that all reasonable efforts will be made to provide the safest environment possible because jurors and other participants in the criminal jury process are compelled to participate in what are often long days in an indoor space, a reality that makes the resumption of trials vastly different from a transient visit to a business establishment. Cf. NACDL Report, at 7 (noting that the format for jury trials in

America involves "indoor, contained settings in which multiple individuals congregate for many hours while some of these individuals engage in projected, high-volume speech").

As of the date of this General Order, there continues to be new emerging guidance on how to safely reopen, to include "virtual town hall meetings" scheduled by the AO with the CDC throughout July to assist judges, unit executives, and federal defenders in making the difficult decisions necessary to allow the judiciary to expand operations in the midst of this deadly pandemic. The Court has submitted numerous questions in advance, as requested, and the answers to some of these questions will require additional planning and other steps, potentially including acquisition of additional personal protective equipment or building/environmental modifications. Complicating most relevant decisions is the reality that the Court must carefully allocate its current limited resources while simultaneously seeking additional funding through certain AO programs, and ultimately through Congress. See Subgroup Report, at 1 (noting that each court will be impacted by its "stage of recovery, funding, and own decision regarding the appropriate steps to take to ensure safety," and that "[a]vailable funding is a consideration").

In determining that trials will resume no earlier than September 14, 2020, the Court has considered the reality that many individuals, including those in communities disproportionately

impacted by the COVID-19 pandemic, do not have child care, to include morning care or afternoon care, while school is not in session in Virginia.  Furthermore, the COVID-19 pandemic has rendered many grandparents or other family members/friends with medical conditions unable to safely assist with child care so that a summonsed parent can appear in this Court.  Accordingly, while not a driving force, the anticipated timeline for the resumption of school in Virginia was another factor highlighted by the Court's experienced jury administrator, and other sources, and it was considered in developing an operational plan designed to provide the greatest likelihood of producing a jury that represents a fair cross-section of the community.  <u>Cf.</u> Subgroup Report, at 2, 4 (indicating that the court should consider juror's "home situations . . . and concerns regarding being away from home," and that "[e]ven healthy jurors not considered particularly vulnerable to COVID-19 may hesitate to serve for a variety of reasons," including the need "to care for children who no longer have school or summer activities to attend").  Feedback from the Office of the Public Defender and the Court's CJA Panel Attorney District Representative only confirmed that the Court's timeline was consistent with the best interest of defendants now awaiting trial.[13]

---

[13] The Court also bases its findings on feedback received during the limited use of recalled grand juries in this District during the COVID-19 pandemic.

## VI. Speedy Trial Findings

Each and every circumstance discussed above was made with careful consideration of defendants', and the public's, speedy trial rights, and after consultation with the U.S. Attorney's Office, Federal Public Defender's Office, and the Court's CJA Panel Attorney District Representative.   As noted throughout this General Order, the Court's unwavering focus, a focus that will continue over the next several months, has been to evaluate and implement all reasonable procedures that will ensure the safety of our jurors and trial participants, while at the same time ensuring that each defendant has a fair trial, with a focused jury and after having had an adequate opportunity to work with his or her attorney to prepare a defense.   Consistent with prior General Orders issued during the pandemic, the Court notes that case-specific speedy trial findings will likely prove necessary for each criminal case with a postponed trial; however, because the pandemic reaches all cases, and impacts all prospective jurors and defendants, the Court hereby finds that, in addition to the periods excluded by prior General Orders, the period of July 7, 2020, through September 13, 2020, is hereby excluded from the speedy trial calculation pursuant to 18 U.S.C. § 3161(h)(7)(A).   The Court makes such "ends of justice" findings after balancing the factors discussed in 18 U.S.C. § 3161(h)(7)(B), as the Court finds that the exclusion of such time from the speedy trial period is necessary to balance the

health and safety of jurors and prospective jurors, court
employees, criminal defendants, counsel, judges, and the public
with the Constitutional responsibility to continue federal court
operations during the COVID-19 outbreak.[14] In concluding that this
Court is not yet able to safely conduct criminal jury trials, the
Court has not only considered the jury's ability to focus, and the
defense bar's concerns regarding the difficulty in preparing for
trial in the midst of the pandemic (which is complicated by newly
implemented policies at certain jail facilities), but also the
concerns voiced by counsel for the Government regarding the
inherent difficulties in safely bringing witnesses to our
Courthouses from out of state (to include in-custody witnesses,
expert witnesses, and others). It is therefore the undersigned
judge's conclusion that justice is best served by resuming trials
no earlier than **September 14, 2020.**

## VII. Conclusion

The operational path forward outlined above for jury trials
in this District, which is subject to modification, was reached
after careful consideration of the risks to the public, jurors and

---

[14] Prospective jurors will technically begin their service on September 11,
2020, as they will be required to call in on that date to learn whether they
need to report in person on Monday, September 14, 2020. The Court considered
whether it was feasible to require reporting one week earlier, but in light
of the timing of the Labor Day weekend, and the anticipated timing of the
resumption of public schools in our District, the Court determined that
requiring reporting a week earlier would likely create a substantial
hardship for many members of the public, and would threaten the Court's
ability to seat a jury representing a fair cross-section of the community.

prospective jurors, litigants, counsel, court employees, and judges, and only after careful consultation with appropriate stakeholders and other judges of this Court. Continued evaluation of local conditions, and conditions across our nation, as well as information from public health authorities, will ultimately determine whether the current plan remains feasible, or whether it becomes necessary to modify the planned approach for the safe resumption of jury trials in this District.

**It is so ORDERED.**

_____
/s/
Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
June __30__, 2020